# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

CHETTIE CLEMOW,                                    Case No. 1:16-cv-994

        Plaintiff,                                    Bowman, M.J.

   v.

COMMISSIONER OF SOCIAL SECURITY,

        Defendant.

## MEMORANDUM OPINION AND ORDER

Plaintiff Chettie Clemow filed this Social Security appeal in order to challenge the Defendant's finding that she is not disabled.[1]  *See* 42 U.S.C. §405(g).  Proceeding through counsel, Plaintiff presents two claims of error for this Court's review.  As explained below, I conclude that the Commissioner's finding of non-disability should be AFFIRMED, because it is supported by substantial evidence in the record as a whole.

### I.  Summary of Administrative Record

On June 3, 2013, Plaintiff filed an application for Disability Insurance Benefits ("DIB"); she filed a related application for social security income ("SSI") on June 19, 2013.  In both applications, she alleged disability beginning on June 21, 2011 due to a combination of physical and mental impairments.

After her claim was denied initially and upon reconsideration, Plaintiff requested an evidentiary hearing before an administrative law judge ("ALJ").  On September 8,

---

[1]The parties have consented to disposition by the undersigned magistrate judge pursuant to 28 U.S.C. §636(c).

1

2015, she appeared with counsel and gave testimony before ALJ Andrew Gollin; a vocational expert also testified. On November 10, 2015, the ALJ issued an adverse written decision, concluding that Plaintiff is not disabled. (Tr. 12-29).

Plaintiff was 39 years old on her alleged disability onset date, and remained a younger individual at the time of the ALJ's decision. She previously worked in multiple jobs, most of which were part-time, including as a bank teller, as a telephone recruiter for product studies, as a personal trainer, as a child care attendant, and as a receptionist. (Tr. 27). There was evidence in the record, including her own testimony, that she continued working part-time into 2013, but there is no dispute that her limitations preclude her from all prior work.

The ALJ determined that Plaintiff has severe impairments of depression, anxiety, attention deficit disorder (ADD), arthritis (knee), fibromyalgia, and a left rotator cuff tear. (Tr. 14). In addition, the ALJ noted non-severe impairments of narcolepsy, substance abuse disorder in remission, and hyperlipidemia. (Tr. 15). The ALJ determined that none of Plaintiff's impairments, either alone or in combination, met or medically equaled any Listing in 20 C.F.R. Part 404, Subpart P, Appendix 1, such that Plaintiff would be entitled to a presumption of disability. (Tr. 15).

Instead, the ALJ found that Plaintiff retains the residual functional capacity ("RFC") to perform a restricted range of sedentary work, subject to the following limitations:

> (1) no more than the occasional push/pull with foot controls using the left lower extremity, and provided the job allows the person to alternate between sitting/standing at will and provided the person is not off task more than 10% of the work day; (2) no more than the occasional climbing of ramps and stairs, no climbing of ladders, ropes, or scaffolds, and no more than occasional balancing, stooping, crouching, kneeling, and crawling; (3) limited to being able to understand, remember, and carry out instructions involving simple, routine, and repetitive tasks that do not

require a fast-paced production rate and do not involve strict production rates or quotas; (4) no more than occasional changes in workplace setting and workplace duties; (5) no more than infrequent and brief interaction with the general public, defined as no more than 5% of the workday with each interaction lasting no more than five minutes; (6) no more than occasional interaction with coworkers and supervisors; (7) work that can be in proximity to others, but not in tandem or as part of a team.

(Tr. 17). Considering Plaintiff's age, education, work experience and RFC, and based on testimony from the vocational expert, the ALJ determined that Plaintiff could still perform a significant number of jobs in the national economy, including work such as a packer, inspector, and bander. (Tr. 28). Therefore, the ALJ determined that Plaintiff was not under a disability. The Appeals Council denied further review, leaving the ALJ's decision as the final decision of the Commissioner.

In her appeal to this Court, Plaintiff argues that the ALJ erred by (1) improperly weighing the medical opinion evidence, and (2) improperly evaluating her credibility. I find no reversible error.

## II. Analysis

### A. Judicial Standard of Review

To be eligible for benefits, a claimant must be under a "disability." *See* 42 U.S.C. §1382c(a). Narrowed to its statutory meaning, a "disability" includes only physical or mental impairments that are both "medically determinable" and severe enough to prevent the applicant from (1) performing his or her past job and (2) engaging in "substantial gainful activity" that is available in the regional or national economies. *See Bowen v. City of New York*, 476 U.S. 467, 469-70 (1986).

When a court is asked to review the Commissioner's denial of benefits, the court's first inquiry is to determine whether the ALJ's non-disability finding is supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is "such relevant

3

evidence as a reasonable mind might accept as adequate to support a conclusion."

*Richardson v. Perales*, 402 U.S. 389, 401 (1971) (additional citation and internal

quotation omitted). In conducting this review, the court should consider the record as a

whole. *Hephner v. Mathews*, 574 F.2d 359, 362 (6th Cir. 1978). If substantial evidence

supports the ALJ's denial of benefits, then that finding must be affirmed, even if

substantial evidence also exists in the record to support a finding of disability. *Felisky v.*

*Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994). As the Sixth Circuit has explained:

> The Secretary's findings are not subject to reversal merely because
> substantial evidence exists in the record to support a different
> conclusion.... The substantial evidence standard presupposes that there is
> a 'zone of choice' within which the Secretary may proceed without
> interference from the courts. If the Secretary's decision is supported by
> substantial evidence, a reviewing court must affirm.

*Id.* (citations omitted).

In considering an application for supplemental security income or for disability

benefits, the Social Security Agency is guided by the following sequential benefits

analysis: at Step 1, the Commissioner asks if the claimant is still performing substantial

gainful activity; at Step 2, the Commissioner determines if one or more of the claimant's

impairments are "severe;" at Step 3, the Commissioner analyzes whether the claimant's

impairments, singly or in combination, meet or equal a Listing in the Listing of

Impairments; at Step 4, the Commissioner determines whether or not the claimant can

still perform his or her past relevant work; and finally, at Step 5, if it is established that

claimant can no longer perform his or her past relevant work, the burden of proof shifts

to the agency to determine whether a significant number of other jobs which the

claimant can perform exist in the national economy. *See Combs v. Commissioner of*

*Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006); 20 C.F.R. §§404.1520, 416.920.

A plaintiff bears the ultimate burden to prove by sufficient evidence that she is entitled to disability benefits. 20 C.F.R. § 404.1512(a). A claimant seeking benefits must present sufficient evidence to show that, during the relevant time period, she suffered an impairment, or combination of impairments, expected to last at least twelve months, that left her unable to perform any job.

### B. Relevant Medical Evidence

Plaintiff does not dispute any findings related to her mental impairments. Therefore, this summary focuses on her physical impairments, with reference to mental health records only insofar as they are relevant to her physical limitations. To support her claim that the ALJ erred in assessing her physical limitations, Plaintiff relies on records that document intermittent complaints of knee pain, two bunion surgeries on her right foot, and surgery to repair a partial tear of her left rotator cuff. She also has been treated by her primary care physician, Dr. Schaible, with medications and referrals to specialists (as appropriate) for depression and anxiety, fatigue attributed to a hypothyroid condition, a vitamin D deficiency, and hyperlipidemia. In addition to the referenced diagnoses, Plaintiff was diagnosed with fibromyalgia in March 2015, six months prior to her hearing before the ALJ.

While not listed as a severe impairment, Plaintiff's obesity was also expressly considered by the ALJ. (Tr. 25). When she began treatment for knee pain on September 10, 2012, Plaintiff was 5'4" and weighed 185 pounds. (Tr. 387, 390). Over time, her weight gradually increased, to 190 pounds on 11/14/12 (Tr. 341), to 195 pounds on April 4, 2013 (Tr. 437), back to 190 pounds on 9/19/13 (Tr. 293), to 194 pounds on 10/21/13 (Tr. 432), and to 200 pounds on June 30, 2014. (Tr. 605).

The orthopedist who first examined Plaintiff for knee pain in September 2012, Dr. Schwegmann, found no locking or instability and prescribed conservative treatment, including 10-14 days of an anti-inflammatory medication and corrective shoes. He directed Plaintiff to return if she did not show marked improvement within a few weeks. (Tr. 391). Plaintiff did not return until November 2012, when she reported new and different left knee pain incidental to a bunion surgery on her right foot that her podiatrist had performed on October 4, 2012. Post-surgery, she had used a scooter for a few weeks, using only her left leg to move and resulting in the knee pain. (Tr. 343). Dr. Schwegmann noted the resolution of the prior knee pain, and diagnosed new "transitional pain" in the left knee. (Tr. 345). Dr. Schwegmann again prescribed anti-inflammatories, along with a short course of physical therapy, with Plaintiff to follow up if her symptoms did not quickly resolve as before. (Tr. 345).

Plaintiff did not return for another ten months, but on September 19, 2013, she reported to Dr. Schwegmann that her left knee pain had worsened due to the use of a walker after foot surgery. (Tr. 295). She reported gaining 20 pounds due to inactivity, although records reflect she weighed the same, at 190 pounds. (Tr. 293, 341). Dr. Schwegmann's clinical notes reflect that she appeared to be in no acute distress, had no warmth or erythema in her knee, and only "a little tenderness on the anserine bursa though near full extension." (Tr. 296). She again had no locking or instability, and hip range of motion was symmetric without pain or discomfort. (Tr. 296). Dr. Schwegmann wrote: "Admittedly, no regular exercise program." (Tr. 295). He counseled Plaintiff "about conditioning and stressed the importance of weight loss for long-term management of this condition." (Tr. 296). Plaintiff declined anti-inflammatories, so he treated her with a cortisone shot. While stating that he found "no indication for surgical

intervention for her knee," he recommended exercise and icing the knee 2-3 times a day "for the next couple of days." (Tr. 296-297). Plaintiff did not return for further treatment.

On September 5, 2013, Plaintiff sought a second opinion before undergoing additional corrective surgery on her right foot. At the time, Plaintiff reported that the October 2012 bunion surgery had been unsuccessful, leaving her with "significant issues with pain." (Tr. 281). However, as the ALJ noted, several prior records suggested that she voice no complaints and had no complications shortly after that surgery, and on October 30, 2012, she was released to begin weight-bearing activity and rehabilitation. (Tr. 18). In fact, Plaintiff did not return to her podiatrist with any complaints of foot pain between November 2012 and August 2013. When she did return in August 2013, her complaints did not correlate with her podiatrist's essentially normal objective findings, and he agreed that a second opinion would be helpful. (*Id.*) In September 2013, the podiatrist from whom Plaintiff sought a second opinion also noted mostly normal findings, including a "stable foot posture with gait and station …stable bilaterally," and "good muscle strength" and a "[f]ull, fluid range of motion for all joints," despite her foot pain. (Tr. 281). However, based in part on a nonunion revealed by x-ray, Plaintiff proceeded with a second corrective surgery on her right foot. There are no reports of any ongoing foot problems after that second surgery on November 1, 2013, and other records reflect that her foot healed well. (*See, e.g.*, Tr. 478, 539, 541, reporting her foot recovered faster than expected, and healed well so that she was able to attend AA meetings).

Plaintiff also relies on the records of Dr. Schaible, Plaintiff's primary care physician since 2006. Dr. Schaible saw Plaintiff regularly, albeit somewhat infrequently, and primarily treated Plaintiff's chronic mental health and hypothyroid conditions. She

conducted a pre-operative exam before Plaintiff's October 2012 foot surgery, and did not see Plaintiff again until a six-month follow-up on April 4, 2013. On October 25, 2013, Dr. Schaible performed a second pre-operative examination in anticipation of the foot surgery scheduled for November 1, 2013, noting Plaintiff's report of the failure of conservative therapy, and "pain with walking and limping to the point of causing knee pain." (Tr. 433). On the same date, Dr. Schaible completed a physical RFC form in which she opined that Plaintiff could not stand or walk for more than 1 hour, or sit for more than 1 hour total in an 8-hour workday. She further opined that Plaintiff could not lift or carry even 5 pounds, and had significant limitations using her arms for reaching. She opined that her patient was required to elevate her right leg waist high for 15 minutes during the single hour she could sit each day, and would miss more than 3 days of work per month. (Tr. 442). The only reasons suggested for such extreme limitations were Plaintiff's diagnoses of depression, anxiety, sleep problems, fatigue, and foot pain, as well as her hypothyroid condition (which was well controlled) and high cholesterol. Dr. Schaible also vaguely referred to Plaintiff's "history."

On June 30, 2014, Plaintiff returned to Dr. Schaible for another 6-month follow-up. She reported feeling "okay" after mental health treatment, and reported her medications for physical symptoms were "working properly." (Tr. 596). Dr. Schaible noted her diet was "poor," with "no exercise." (*Id.*) Plaintiff reported continuing "knee problems" and a planned shoulder surgery. (*Id.*) Her physical examination was entirely normal. At the June 2014 appointment Dr. Schaible added the diagnoses of "arthritis – stable" and a left rotator cuff tear. On April 14, 2015, Dr. Schaible completed a second physical RFC form in which she endorsed the same extreme limitations listed eighteen

months earlier, except that Plaintiff was no longer required to elevate her leg and would miss 2-3 days per month instead of more than 3 days per month.

Plaintiff underwent arthroscopic rotator cuff repair surgery on July 28, 2014. (Tr. 747-748). There is no further record of treatment for that condition.

On February 7, 2015, Plaintiff presented to the ER complaining of a sudden onset of back pain in her right sciatica/buttock area. (Tr. 712). She was treated for pain and muscle spasm and directed to follow-up with her physician. Five days later, she was again seen by Dr. Schaible, reporting a history of episodic back pain that typically resolves within a few days. She reported her back pain was already improving, that her shoulder was doing well post-surgery, and that she was continuing physical therapy for her knee and elbow. (Tr. 659). Her physical examination was entirely normal other than some remaining pain in her right buttock, with a positive right leg raise. (*Id.*)

On March 11, 2015, Plaintiff sought evaluation by Dr. Adhikari, a rheumatologist. Plaintiff reported fatigue and a 20-year history of aches and pains. Dr. Adhikari diagnosed fibromyalgia and osteoarthritis, after documenting her finding of 18/18 trigger points. She prescribed medication to treat muscle spasms/pain, a lumbar back brace, a hinged knee brace, and aquatic therapy. (Tr. 806). She also prescribed a cane to assist Plaintiff as needed, although Plaintiff testified that she is too embarrassed to use it. (Tr. 686, 58). At a three month follow-up on June 15, 2015, Dr. Adhikari counseled Plaintiff to increase her activity level. Plaintiff reported that water therapy had been helpful, and acknowledged "that physical reconditioning is an important part in terms of management." (Tr. 810). Dr. Adhikari's examination findings were mostly normal, noting a normal gait, full strength, and no evidence of tenderness or swollen or inflamed joints. She noted a reduction of tender points to 12/18. (Tr. 812).

Despite the effectiveness of the prescribed water therapy, Plaintiff reported that she had stopped going because she wanted to "save" some sessions under her insurance in order to be able to return to therapy after a planned knee replacement. However, other than Plaintiff's own references, there is no evidence that such surgery has ever been recommended, much less scheduled.[2]  On September 24, 2015, Dr. Adhikari saw Plaintiff a third time, noting 15/18 tender points and paraspinal muscle spasms but few other abnormal findings, with no tender, swollen or inflamed joints, full strength in the extremities, normal neurological exam, and a normal gait. (Tr. 818).  On the same date, Dr. Adhikari completed a physical RFC form in which she opined that Plaintiff could stand/walk for less than an hour, and also could sit for less than one hour in a day due to her diagnoses of fibromyalgia and depression.  (Tr. 784-788).[3]

### C.  Plaintiff's Claims of Error

### 1.  The ALJ's Evaluation of the Medical Opinion Evidence and Plaintiff's Residual Functional Capacity

As noted, the ALJ restricted Plaintiff to less than the full level of sedentary work. A vocational expert testified that in light of Plaintiff's relatively young age and other characteristics, an individual with her RFC can still perform a significant number of jobs in the national economy.  "Substantial evidence may be produced through reliance on the testimony of a vocational expert in response to a 'hypothetical' question," as long as the hypothetical question accurately portrays the actual limitations of the Plaintiff.  *See*

---

[2]As summarized above, Dr. Schwegmann's records reflect only brief periods of knee pain, treated conservatively, and a clear statement that there is "no indication for surgical intervention."  (Tr. 296-297).

[3]Plaintiff's counsel submitted an additional narrative report from Dr. Adhikari, dated July 27, 2016, to the Appeals Council.  (Tr. 822).  Because the Appeals Council did not find that evidence to warrant further review and it was not considered by the ALJ, it may not be considered by this Court in determining whether the ALJ's decision is supported by substantial evidence.  *See Cline v. Commissioner of Social Sec.*, 96 F.3d 146, 148 (6th Cir.1996) ("[W]here the Appeals Council considers new evidence but declines to review a claimant's application for disability insurance benefits on the merits, the district court cannot consider that new evidence in deciding whether to uphold, modify, or reverse the ALJ's decision).

*Varley v. Sec'y of Health & Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987).  In this case, Plaintiff argues that the ALJ erred by failing to accept the work-preclusive physical limitations endorsed by her two treating physicians, and instead formulating a physical RFC that was not supported by substantial evidence.[4]

The relevant regulation regarding treating physicians provides: "If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight." 20 C.F.R. § 404.927(c)(2); *see also Warner v. Com'r of Soc. Sec.,* 375 F.3d 387, 390 (6th Cir. 2004); SSR 96-2p. The Commissioner is required to provide "good reasons" if the Commissioner does not give controlling weight to the opinion of a treating physician. *Id.*  Additionally, in cases when an ALJ does not give controlling weight to the opinion of a treating physician, the ALJ must explain the weight given to the opinion after considering the following relevant factors:  the length, nature, and extent of treatment relationship, evidence in support of the opinion; consistency with the record as a whole; and the physician's specialization.  20 C.F.R. § 416.927(c).

The treating physician rule generally requires the ALJ to give "greater deference to the opinions of treating physicians than to the opinions of non-treating physicians." *See Blakley v. Com'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009). Nevertheless, "[i]n appropriate circumstances," the opinions of non-examining consultants "may be entitled to greater weight than the opinions of treating or examining sources." *Id.,* 581 F.3d at 409 (quoting Soc. Sec. Rul. 96-6p, 1996 WL 374180, at *3

---

[4]Plaintiff does not appeal any findings concerning her mental limitations. No treating psychologist or psychiatrist provided relevant opinion evidence, but a consulting psychologist provided a mental RFS assessment in November 2013.  The ALJ gave his opinions only "*some weight.*"  (Tr. 27).

(July 2, 1996)). Thus, no reversible error occurs when an ALJ determines that a treating physician opinion is not entitled to controlling weight because it is not well-supported, is internally inconsistent, and/or is inconsistent with the record as a whole.

In addition, the regulations draw distinctions between the type of medical "opinions" from treating physicians that are entitled to controlling weight, and legal determinations that must be made by an ALJ. "When a treating physician…submits an opinion on an issue reserved to the Commissioner – such as whether the claimant is 'disabled' or 'unable to work' the opinion is not entitled to any particular weight." *Turner v. Com'r of Soc. Sec.*, 381 Fed. Appx. 488, 492 (6th Cir. 2010); *see also* 20 C.F.R. § 416.927(d)(1). Finally, it is the ALJ who remains responsible to determine a claimant's RFC. 20 C.F.R. §416.936(c).

On the record presented, the ALJ gave "some weight" to the physical RFC opinions of a non-examining consultant, and "limited" or "little" weight to the opinions of the two treating physicians. In other words, the ALJ declined to give "great weight" or adopt fully any of the three medical RFC opinions, instead formulating Plaintiff's physical RFC based on his assessment of the record as a whole, including Plaintiff's testimony and medical records. Reviewing each of the three medical opinions, the undersigned finds substantial support for the weight given to the opinion evidence, and for the ALJ's determination of Plaintiff's physical RFC.

### a. Dr. Klyop

The ALJ first explained that he was giving only "some weight" to the December 2013 opinions of a consulting physician, Dr. Klyop, who opined that Plaintiff could perform medium work with some additional postural and foot control restrictions. (Tr. 25). Based upon treatment records that were dated after Dr. Klyop's review, "including

treatment for a rotator cuff tear and recent treatment for fibromyalgia," the ALJ determined that Plaintiff was significantly more limited. (Tr. 25). Plaintiff does not directly challenge that assessment, but criticizes the fact that any weight at all was given to Dr. Klyop's opinions because he reviewed "a markedly undeveloped record." (Doc. 9 at 15). Because the ALJ imposed significantly greater restrictions than endorsed by Dr. Klyop, and explained the basis for those limitations, I find no error.

### b. Dr. Schaible

Plaintiff next objects to the ALJ's failure to give controlling weight to the extreme limitations endorsed by Dr. Schaible and Dr. Adhikari. She argues that even if the ALJ did not err by refusing to assign controlling weight to their opinions, the ALJ still committed reversible error by failing to give their opinions greater weight than given to Dr. Klyop, after considering the factors set forth in 20 C.F.R. § 404.1527(c)(2)-(6) and §416.927(c)(2)–(6),

Dr. Schaible completed three separate medical source statements: (1) a mental health questionnaire dated 7/20/13 (Tr. 258-260); (2) a physical RFC form dated 10/25/13 (Tr. 441-442, *see also* Tr. 448-449); and (3) a similar "disability" form dated 4/14/15 (Tr. 672-675, *see also* Tr. 694-696). On both the 2013 and 2015 RFC forms, Dr. Schaible stated that Plaintiff could sit for only 1 hour (or less), and could stand and/or walk for less than 1 hour in an 8-hour workday, with the same limitations applicable since January 1, 2011, a date that precedes Plaintiff's alleged onset of disability. (Tr. 442; Tr. 674). In 2013, Dr. Schaible also opined that Plaintiff needed to elevate her right leg when sitting to waist level, for 15 minutes every hour, presumably relating to the foot surgery that Plaintiff reported on 11/13/13, although she did not indicate any particular time frame or reasons for the limitation. (Tr. 710). In 2013, Dr.

Schaible declared that Plaintiff could only occasionally use her arms for reaching. (Tr. 442). In 2015, Dr. Schaible opined that Plaintiff was no longer required to elevate her leg, again with no explanation for the change. (Tr. 674). In the later form, she limits Plaintiff to only occasionally lifting or carrying up to 10 pounds, but does not include reaching limitations. (Tr. 674). The sole basis for these extreme limitations on both forms was a brief list of diagnoses. (Tr. 441, 672). The diagnosis of anxiety/depression is circled for emphasis on the 2013 form, (Tr. 441), and on the 2015 form Plaintiff's symptoms are listed as "anxiety/depression, BAD," "general body pain" and left knee pain. (Tr, 673).

The ALJ reasoned that Dr. Schaible's opinions were entitled only to "limited weight" because they were not at all well supported and were inconsistent with Dr. Schaible's own clinical records:

> These various medical source statements invariably call for severe medical and psychological limitations that effectively preclude all competitive employment. However, as discussed throughout the decision, Dr. Schaible's own progress notes have been routine in nature and consisted of rather conservative treatment with relatively unremarkable findings. Moreover, despite providing several medical statements, Dr. Schaible failed to provide either an objective explanation or citation to her record in support of any of her specific limitations. Rather, she essentially listed impairments, medication[s], and the claimant's subjective complaints.
>
> The lack of any objective explanation regarding her opinion when coupled with her rather routine and underwhelming treatment of the claimant certainly does not appear consistent with the level of dysfunction advocated in her various statements. Consequently, despite her status as a treating physician, Dr. Schaible's opinions do not warrant controlling weight. Moreover, these inconsistencies have resulted in the …finding that [her] opinion warrants only limited weight.

(Tr. 26).

In a summary of the medical evidence, the ALJ detailed multiple records from Dr. Schaible that were inconsistent with the extreme limitations that she endorsed. For

14

example, in April 2013, Plaintiff reported feeling well with no complaints, and in another record, Dr. Schaible indicated that her patient's chronic conditions were essentially controlled with prescribed medications. (Tr. 18). Having closely examined all of Dr. Schaible's records including the physical RFC forms, the undersigned finds that the ALJ's analysis easily complies with the regulatory requirements, and constitutes "good reasons" for giving Dr. Schaible's unsupported opinions "limited" weight.

### c.  Dr. Adhikari

The ALJ also gave "little weight" to the September 2015 medical assessment completed by Plaintiff's treating rheumatologist, Dr. Adhikari. Like Dr. Schaible, Dr. Adhikari opined that Plaintiff could sit for less than one hour total in an 8-hour work day, and could stand and/or walk also for less than 1 hour per day. (Tr. 787). Further refining the limitation to less than one hour (total) of sitting, Dr. Adhikari stated that Plaintiff must avoid continuous sitting, would be required to get up and move around from a seated position every 20-50 [illegible] and that it would be "20-30" before she could return to a seated position. Dr. Adhikari opined that her patient can "never/rarely" lift or carry 0-5 pounds, that she has significant limitations in reaching, handling, or fingering," and that she can "never/rarely" grasp, turn and twist objects, use her hand/fingers for fine manipulations, use either of her arms for reaching, including overhead reaching. (Tr. 787). She further opined that she did not believe that Plaintiff could "be placed in competitive environment," and that her patient's pain, fatigue, or other symptoms would "frequently" interfere with attention and concentration. (Tr. 788). She also stated that Plaintiff would need unscheduled breaks at unpredictable intervals for 30 minutes at a time, every 20-30 minutes, and that she would be absent from work more than three times per month.

15

Dr. Adhikari concluded that her patient's symptoms and limitations likely started 10 years ago –long before Plaintiff's alleged onset date - based upon her patient's report. (Tr. 788).    Dr. Adhikari did not respond to a question asking her to list medications prescribed, dosage, and any side effects, and also failed to respond to a question asking if she medically recommended that her patient avoid certain activities as a result of medication side effects.  (Tr. 786).  However, on the questionnaire form, she checked off multiple symptoms that she believed reflected "six or more fibromyalgia symptoms, signs or co-occurring conditions," ranging from "fibro fog" to fatigue, insomnia, irritable bowel syndrome, depression, blurred vision, nervousness, bladder spasms, dizziness, headache, muscle weakness, and numbness/tingling. (Tr. 785). Most of the referenced symptoms do not appear elsewhere in Dr. Adhikari's clinical records, or in other medical records.

The ALJ acknowledged that Dr. Adhikari had diagnosed Plaintiff with fibromyalgia based upon recognized criteria for that condition, but pointed out that she had seen Plaintiff on only three occasions over a few months.   The ALJ explained that Dr. Adhikari's opinions were not entitled to controlling weight because they were completely unsupported and were inconsistent with other substantial evidence:

> Essentially, Dr. Adhikari recommend[ed] work restriction[s] that effectively precludes all competitive employment including indicating that the claimant could sit, stand, and walk for only a total [of] 2 hours in an 8-hour work day, that she could lift no more than 5 pounds, never perform any fine or gross motor activities with eight [sic] hand, that she would require an unacceptably high number of days [absent] per month.   In making these recommendations, Dr. Adhikari did not provide any explanation or analysis regarding her recommended restrictions.
>
> The nature and extent of restrictions recommended …are inconsistent with her rather underwhelming, albeit brief, treatment history.    Dr. Adhikari'[s] record clearly shows rather good improvement in the claimant's fibromyalgia-related issues with increased activity, which appears counterintuitive with recommendations that the claimant is

exertionally unable to work for even 2 hours a day. Moreover, Dr. Adhikari's other physical finding[s] at Exhibit 16F were essentially normal including no observed weakness or motor deficits at any extremity, which again is inconsistent with her expressed concerns regarding manipulative ability. Finally, the claimant's medical/mental treatment history has consisted of essentially routine management of symptoms, aside from a few other successful surgeries. Such routine treatment does not appear consistent with the level of absenteeism described by Dr. Adhikari at Exhibit 15F.

Given the marked contrast between her actual treatment of the claimant and objective observations when compared to her recommended work restrictions, the undersigned finds that Dr. Adhikari's opinion does not warrant controlling weight. Further, these inconsistencies also demonstrate that Dr. Adhikari's opinion warrants little weight, especially when one also considered the unremarkable nature of treatment that the claimant has received from other medical sources.

(Tr. 26).

As Plaintiff correctly points out, the condition of fibromyalgia can result in disability due to pain and fatigue even when physical examinations reflect few abnormal findings. On the other hand, Plaintiff was not diagnosed with fibromyalgia until March 2015, nearly four years after her disability onset date, and many of her complaints relate to other conditions. Certainly, a mere diagnosis of fibromyalgia does not mandate a disability finding, as many people who suffer from that condition retain the ability to work. *See Tyrpak v. Astrue*, 858 F. Supp.2d 872 (N.D. Ohio 2012) (affirming ALJ determination that plaintiff who suffered from fibromyalgia, back impairment, major depressive disorder and obesity could still perform light work, holding that ALJ articulated good reasons for rejecting unsupported opinions of primary care physician and treating rheumatologist).

At the time she rendered her opinions, Dr. Adhikari had examined Plaintiff only three times and had counseled her to increase her activity level and reconditioning as part of treatment. It appears that the extreme limitations that Dr. Adhikari endorsed

(which she stated were <u>not</u> expected to last at least 12 months, *see* Tr. 784), were based on the combination of fibromyalgia and depression.[5] Although she endorsed a long "check-list" of symptoms, few of those symptoms are recorded either in Dr. Adhikari's notes or anywhere else in Plaintiff's records, and her recommendation that Plaintiff increase her activity level stands in contrast to the extreme limitations she endorses. Having reviewed Dr. Adhikari's records, the undersigned finds that the ALJ's analysis complies with the "good reasons" requirement and is substantially supported.

Plaintiff generally complains that the ALJ failed to describe how he arrived at her physical RFC, since he did not primarily rely on any of the three referenced medical opinions. Although Plaintiff accuses the ALJ of making up her RFC "out of whole cloth," (Doc. 9 at 17), the ALJ's opinion contains a detailed analysis of Plaintiff's medical records and history, including references to her many normal clinical examinations and inconsistencies in the records to support her alleged level of limitations.

Relevant agency regulations and Sixth Circuit precedent provide that the ALJ is charged with the final responsibility in determining a claimant's RFC. *See* e.g., 20 C.F.R. §§ 404.1527(e)(2), 416.927(e)(2)(explaining that the final responsibility for deciding the RFC "is reserved to the Commissioner."). The regulations further state that ALJs are "responsible for reviewing the evidence and making findings of fact and conclusions of law." 20 C.F.R. § 404.1527(f)(2), 416.927(f) (2). There is no legal requirement that each limitation in an RFC determined by a ALJ correspond to a specific medical opinion. Indeed, ALJs are not bound by any medical opinion on an issue reserved to the Commissioner (*i.e.,* a claimant's RFC finding). 20 C.F.R. §

---

[5]To the extent she based the limitations on Plaintiff's mental impairment, it is worth noting that other providers treated Plaintiff's depression, and that Plaintiff has does not challenge the ALJ's mental RFC findings.

404.1527(d)(2)-(e), 416.927(d)(2)-(e). Moreover, the Sixth Circuit has repeatedly upheld ALJ decisions where the ALJ rejected medical opinion testimony and determined an RFC based on objective medical evidence and non-medical evidence. *See Ford v. Com'r of Soc. Sec.,* 114 Fed. Appx. 194 (6th Cir.2004); *Poe v. Com'r of Soc. Sec.,* 2009 WL 2514058, at *7 (6th Cir.Aug.18, 2009). Here, the ALJ adequately articulated the basis for the RFC he determined, and that RFC is substantially supported by the record as a whole.

### 2. Credibility Determination

It is the Plaintiff who retains the ultimate burden of proving that she was disabled in this case. *See Born v. Sec'y of Health and Human Servs.*, 923 F.2d 1168, 1173 (6th Cir. 1990). In cases like this one, where there is relatively minimal objective or clinical evidence to support Plaintiff's insistence that she would be unable to walk/stand or sit more than 2 hours in an 8-hour day, the ALJ's assessment of Plaintiff's credibility is often very significant. As her second claim of error, Plaintiff contends that the ALJ improperly found that she was not fully credible.

An ALJ's credibility assessment must be supported by substantial evidence, but "an ALJ's findings based on the credibility of the applicant are to be accorded great weight and deference, particularly since an ALJ is charged with the duty of observing a witness's demeanor and credibility." *Walters v. Com'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997). Further, a credibility determination cannot be disturbed "absent a compelling reason." *Smith v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001). Thus, it is proper for an ALJ to discount the claimant's testimony where there are contradictions among the medical records, her testimony, and other evidence. *Warner v. Com'r of Soc. Sec.*, 375 F.3d at 387.

19

Here, the ALJ determined that "the severity and frequency of [Plaintiff's] alleged symptoms is inconsistent with the objective medical evidence of record...." (Tr. 17). The ALJ concluded that

> [T]he claimant's medically determinable impairments could reasonably be expected to cause some of the alleged symptoms; however, [her] statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible for the reasons explained in this decision.....

(Tr. 23). He found Plaintiff's statements to be inconsistent with objective findings and clinical examinations, (Tr. 17-20, 23), and noted that she reported "very hectic and varied daily activities." (Tr. 25).

Regarding the apparent disconnect between the objective medical evidence and Plaintiff's subjective complaints, the ALJ explained:

> Regarding overall credibility, the objective medical evidence simply does not support the allegations regarding the severity of the claimant's subjective complaints. For example, the evidence fails to document that the claimant has demonstrated signs typically associated with chronic, severe pain such as muscle atrophy, spasm, rigidity, or tremor. Moreover, despite claims of debilitating pain, physical findings on examination have been relatively unremarkable and not suggestive of complete work preclusion. Moreover, diagnostic imaging has failed to reveal significant pathology that correlates with her allegations of severe and constant pain over much of her body including her back, knees, and shoulder.

(Tr. 23). The ALJ also explained that although the Plaintiff

> described having several significant ongoing physical problems such as persistent left shoulder pain and dysfunction, back pain, and persistent left knee pain and dysfunction, [and]...that she does not use a cane out of embarrassment and further claimed that medical personnel have recommended a left knee replacement,...she has not pursued this avenue of treatment due to anxiety. Of note, she has not alleged any substantial ongoing problems stemming from bunions or other foot deformities.

(Tr. 22). The ALJ noted that Plaintiff acknowledged that her current combination of over-the-counter and prescribed medications was beneficial, despite reported adverse side effects including tiredness and lethargy. (Tr. 22). She was able to participate in

physical therapy and water therapy. She claimed that she had been referred to an orthopedic consultation regarding knee surgery, but that she had not followed through; yet, there was no evidence at all concerning any recommended knee replacement in the record, with her orthopedist concluding that surgical intervention was not warranted. (Tr. 22, 24).

The ALJ acknowledged that Plaintiff's more recent diagnosis of fibromyalgia "typically is not associated with substantial objective deficits," but found the "physical findings from her rheumatologist [to be] inconsistent with the level and nature of dysfunction alleged by the claimant." (*Id.*) Additionally, despite Plaintiff's report of significant problems related to her surgically repaired rotator cuff tear, as recently as September 2015, Dr. Adhikari observed full strength in all extremities with no deficits. (Tr. 23). "Such unremarkable findings are inconsistent with the nature of the [claimant's] allegations and suggest some degree of exaggeration…in an effort to improve her changes of being awarded benefits." (Tr. 23-24). While acknowledging the two foot surgeries and rotator cuff repair, the ALJ also more generally cited Plaintiff's "relatively conservative and non-aggressive" treatment as "inconsistent with" her allegations of disability. (Tr. 24). The ALJ specifically cited both the effectiveness of her surgeries and physical therapy, and the fact that her pain treatment "has consisted of medication management with good result." (Tr. 24).

The undersigned finds the ALJ's credibility assessment to be well-supported. In addition to the records specifically noted, other records support the ALJ's references to inconsistencies and Plaintiff's "very hectic and varied daily activities." Plaintiff frequently reported to her mental health providers that her foot had healed well, that she was attending AA meetings, and in 2013, that she was "feeling optimistic about her possible

job prospects." (Tr. 530, 539, 541). She reported spending her days: "Run, Stuff for my daughter, plays basketball. Appointments. I have a to do list every day." (Tr. 461). In January 2013, she applied to work at the casino, but did not make it through the first round. (Tr. 462). In June of 2013, she reported she was actively engaged and doing better, including being able to get out of the house more. (Tr. 487). The same month, she stated she was working part time, doing some studies to earn money, but stated she was not looking for full-time work due to sleepiness. She also admitted a recent DUI as well as a disorderly conduct offense. (Tr. 473). In August 2013, she reported "benefits of increased activity level" due to her daughter transitioning back to school. (Tr. 490; *see also* Tr. 493, report of "increasing structure, staying busy" and "begun applying for P/T employment"). In September 2013, she reported "planning for entering vocational program in the near future," and spoke of cleaning out her home and an upcoming wedding. (Tr. 495). Such records clearly undermine Plaintiff's claims of extreme physical limitations that precluded her from standing/walking or sitting for a total of less than 2 hours in an 8 hour day. Thus, the record as a whole strongly supports the ALJ's determination that Plaintiff was not as physically incapacitated by her impairments as alleged.

### III. Conclusion and Recommendation

For the reasons explained herein, **IT IS ORDERED THAT** Defendant's decision be **AFFIRMED** as supported by substantial evidence, and that this case is **CLOSED.**

 */s Stephanie K. Bowman*
Stephanie K. Bowman
United States Magistrate Judge